UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

KATHLEEN C. BENISON and
CHRISTOPHER BENISON,

                  Plaintiffs,                      Case No. 12-cv-15226

v                                               Honorable Thomas L. Ludington

GEORGE ROSS, E. GARY SHAPIRO, IAN R.
DAVISON,

                  Defendants.

_____/

**OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

Plaintiffs Kathleen and Christopher Benison brought a § 1983 action against three Central Michigan University officials claiming that the school unlawfully retaliated against them for exercising their First Amendment rights.

On August 12, 2013, Defendants filed a motion for summary judgment. Because Plaintiffs Kathleen Benison and Christopher Benison have not established a prima facie case for First Amendment retaliation, the Court will grant Defendants' motion for summary judgment.

**I**

Plaintiffs' case stems from Christopher Benison's participation in CMU's Academic Senate in December 2011. Mr. Benison, then a student at CMU, co-sponsored a motion for a no confidence vote in President George Ross and Provost E. Gary Shapiro. The no confidence vote passed in the Senate and was ultimately endorsed by 19 university departments.

Plaintiffs allege that they suffered several harmful consequences in retaliation for Mr. Benison's role in the no confidence vote. In particular, Mr. Benison claims his transcript was

withheld from him, and Kathleen Benison, formerly a professor of Geology at CMU, claims that she was denied a promotion and forced to return compensation paid to her in retaliation for her husband's no confidence vote.

## A

Central Michigan University hired Dr. Kathleen Benison in 1997 as an Assistant Professor in the Department of Geology. Dr. Benison was promoted to Associate Professor in 2003 and tenured Professor in 2008. Pls.'s Resp., Ex. 4. During her employment, Dr. Benison received multiple National Science Foundation grants, published in over thirty publications, and received several university awards, including the Excellence in Teaching Award, the Provost's Award for Outstanding Research and Creative Activity, and the President's Award for Outstanding Research and Creative Activity. Resp. Ex. 2.

Despite her teaching and research awards, Dr. Sven Morgan, the Chair of the Earth and Science Department, believed that Dr. Benison was not fulfilling her service obligations in 2010. Defs.' Mot. Summ. J. Ex. 3 at 3. Dr. Morgan stated: "[I]n my view, Dr. Benison was not contributing leadership to Department service activities, which caused junior faculty members, who had not yet achieved tenure or who were still Associate Professors to do extra service activities." *Id.*  Dr. Morgan identified one example in particular: Dr. Morgan had asked Dr. Benison and another senior faculty member to complete the WEAVE assessment plan for CMU's online system in September 2010. *Id.* at 2-3. When Dr. Benison refused, Dr. Morgan reminded her that the EAS Department bylaws require professors to demonstrate "high quality leadership in service activities" to receive further promotion, including salary supplements. *Id.* at 3.

About that same time in fall 2010, Dr. Benison applied for sabbatical leave, which was approved for the Spring 2012 semester. Resp. Ex. 8. Provost Shapiro informed Dr. Benison that she would be required "[t]o return to CMU for at least one academic year following the leave or to refund the salary and benefits paid by CMU during the leave." *Id*. On January 13, 2011, Dr. Benison signed the "Agreement to be Signed by Recipient of Leave of Absence with Compensation", in which Dr. Benison agreed to "return to [CMU] . . . for one full contractual period following the termination of my leave or to refund the compensation paid to me by CMU for the period of my leave." Resp. Ex. 10.

During the 2011 Fall Semester, CMU relieved Dr. Benison from all her teaching assignments for the semester so that she could focus on research. Mot. Summ. J. Ex. 3. Even though Dr. Benison was not teaching, Dr. Morgan believed that Dr. Benison was not meeting her service requirements for the semester based on two events. First, Dr. Benison refused to serve as the faculty advisor for the CMU Geology Club. Mot. Summ. J. Ex. 32. Second, Dr. Benison asked whether she should attend the EAS Department's retreat, which all tenure track faculty are expected to attend. Mot. Summ. J. Ex. 33. Dr. Morgan alerted Dean Davison to his concerns, and Dean Davison reminded Dr. Benison that she was still expected to participate in service activities during the 2011 Fall Semester. Mot. Summ. J. Ex. 34.

**B**

Plaintiff Christopher Benison is Dr. Benison's husband and was a student at CMU. Mr. Benison participated in the creation of a new student organization called Students for Faculty and was a member of the Academic Senate. Compl. ¶ 11.

As a member of the Academic Senate, Mr. Benison and another student submitted a motion of "no confidence" against CMU President George Ross and Provost E. Gary Shapiro.

Resp. Ex. 11. The motion asserted that President Ross and Provost Shapiro "have engaged in communication practices that undermine transparency and accountability; have effectively interfered with the practice of shared governance; and thus have eroded mutual trust among the administration, faculty, and students." *Id*. The Academic Senate passed the motion on December 6, 2011.

The CMU Board of Trustees addressed the vote of "no confidence" at a meeting two days later. Some of the CMU Deans, including Dean Ian R. Davison, presented a letter supporting President Ross and Vice President Shapiro at the meeting:

> In view of the narrow no-confidence vote at the Academic Senate on Tuesday, December 6th, 2011, we, the undersigned Deans of the seven academic colleges, believe it is important to communicate immediately, and as forcefully as possible, the following to the Board of Trustees of Central Michigan University. President George E. Ross and Provost and Executive Vice President Dr. E. Gary Shapiro have our complete confidence and support . . . We are all honored to work with individuals of such high caliber and any effort to undermine their leadership at CMU is detrimental to the future of this institution.

Resp. Ex. 16.

## C

Dr. Benison's sabbatical began on January 9, 2012. Although she was not required to, Dr. Benison continued to perform some of her usual duties as a professor such as supervising research students and representing CMU at professional meetings. Compl. ¶ 16.

A few days into the sabbatical semester, Dr. Benison applied for a promotional salary supplement available to professors who apply and meet certain criteria. Resp. Ex. 17. The Faculty Association Agreement governs the process by which faculty apply for promotions. The application process includes several stages: first, the applicant's academic department will judge the extent to which the applicant has fulfilled the requirements for promotion. Mot. Summ. J. Ex. 12 at 10. Next, the department's recommendation is forwarded to the college dean, who will

make an independent review and recommendation on the application. *Id*. at 11. Then, the Provost, with input from the President, will review the application and render an independent recommendation on the application. *Id*. at 12. Finally, the Provost's recommendation is forwarded to the Board of Trustees, who approve of or disagree with the recommendations. *Id*. at 12.

Dr. Benison began the application process on January 16, 2012, by submitting her twenty-seven page application to the EAS Department. Resp. Ex. 17. At the EAS Department faculty meeting on January 27, 2012, eight of nine faculty members voted that Dr. Benison had not fulfilled her service obligations, which is one of the criteria for promotion. Resp. Ex. 18. The majority opinion stated Dr. Benison had not contributed high quality leadership; instead, Dr. Benison had engaged in "short-term, time limited commitments." Mot. Summ. J. Ex. 20. The faculty then voted six to three against Dr. Benison's application for a salary supplement. Resp. Ex. 18.

After the EAS Department voted against her application for a salary increase, Dr. Benison began the appeals process outlined in the Faculty Association Agreement. Dr. Benison submitted her appeal paperwork to Dean Davison, who was tasked with reviewing the EAS Department's recommendation. In addition to submitting a nine-page letter outlining her disagreements with the EAS Department's conclusions, Dr. Benison also procured a faculty advocate to represent her during the appeal. Mot. Summ. J. Ex. 21 & 22.

On April 12, 2012, Dean Davison issued his recommendation that Dr. Benison's application for a salary increase should be denied. Specifically, Dean Davison found "no compelling evidence to support overturning the negative recommendation of the department . . . ." Mot. Summ. J. Ex. 25 at 3.

After Dean Davison issued his negative recommendation, Dr. Benison requested an in-person meeting with him to "address errors of fact" in his recommendation. After the meeting, Dean Davison affirmed his previous recommendation to deny the salary increase on May 7, 2012. Mot. Summ. J., Ex. 28. Dean Davison's recommendation explains:

> Despite the representations made by Dr. Benison as well as her advocate (a faculty member from another department) to my advisory committee, and Dr. Benison's long rebuttal to the department recommendation (which is in my opinion consistent with the department's criticism regarding an avoidance of onerous but critical service and a focus on those activities that require short-term or limited time commitments), I find no compelling evidence to support overturning the negative recommendation of the department . . . .

*Id*.

Dr. Benison appealed Dean Davison's recommendation to Provost Shapiro, who was tasked with reviewing Dr. Benison's application and making a decision on whether to grant or deny the salary increase. Dr. Benison submitted a three-page appeal of Dean Davison's recommendation on May 14, 2012, one week after Dean Davison affirmed his recommendation. Provost Shapiro confirmed that he received her appeal in an e-mail dated May 15, 2012. MSJ Ex. 30.

Two days after submitting her appeal, Dr. Benison told a colleague that she and her husband had "decided to move to WV" so that she could take a job at the West Virginia University.  MSJ Ex. 29. By May 17, 2012, Dr. Benison had given a verbal commitment to work at WVU in the fall of 2012. MSJ Ex. 37.

Dr. Benison tendered her letter of resignation on June 6, 2012. MSJ Ex. 40. At that time, Provost Shapiro had not yet made a final determination on whether to grant or deny Dr. Benison's application for a salary increase. Provost Shapiro ultimately considered the issue moot because Dr. Benison resigned. Mot. Summ. J., Ex. 11 at 85.

**D**

On June 21, 2012, Dean Davison informed Dr. Benison that she had breached her obligations under her 2012 Sabbatical Agreement by resigning. Dean Davison reminded Dr. Benison that "[s]abbaticals are awarded contingent on the faculty member's agreement to return to their regular assignment for at least one year (12 months)." Mot. Summ. J. Ex. 45. Dean Davison stated that the total compensation owed to the university was $58,662.25, which included Dr. Benison's salary and benefits from the Spring 2012 semester. This total did not, however, include a Spring 2012 tuition waiver for her husband valued at $4,296.00. Mot. Summ. J. Ex. 46.

When Dr. Benison refused to make payment arrangements, CMU filed a lawsuit in state court to recover $62, 958.25 (the amount of Dr. Benison's compensation for the spring semester plus the value of her husband's tuition waiver). Resp. 18. CMU also placed a hold on Christopher Benison's academic transcript. *Id*. at 28.

**II**

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must "set out specific facts showing a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether

the evidence presents a sufficient disagreement to require submission to a jury or whether it is so

one-sided that one party must prevail as a matter of law." *Id*. at 251-52.

### III

Section 1983 provides a cause of action against any person who, acting under color of

state law, abridges rights created by the Constitution and laws of the United States. 42 U.S.C. §

1983; *Neuens v. City of Columbus*, 303 F.3d 667, 670 (6th Cir. 2002).

To establish a prima facie claim of First Amendment retaliation, Plaintiffs must

demonstrate that: (1) they engaged in constitutionally protected speech or conduct; (2) an

adverse action was taken against them that would deter a person of ordinary firmness from

continuing to engage in that conduct; and (3) there is a causal connection between elements one

and two—that is, the adverse action was motivated at least in part by their protected conduct.

*Scarbrough v. Morgan County Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006) (citing *Thaddeus–*

*X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc)).

If Plaintiffs establish that their protected conduct was a motivating factor behind the

adverse action, the burden shifts to Defendants to show they would have taken the same action in

the absence of the protected activity.  *Thaddeus-X v. Blatter*, 175 F.3d 378, 399 (6th Cir. 1999)

(citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977)).  If Defendants

can make that showing, they are entitled to summary judgment.  *Thaddeus-X* at 399.

### A

As to the first element, the parties do not dispute that the Plaintiffs engaged in

constitutionally protected speech and conduct. Mr. Benison's motion for a no confidence vote in

the Academic Senate is constitutionally protected speech. *See Mihalick v. Cavanaugh*, 26 F.

Supp. 2d 391, 396 (D. Conn. 1998) (holding a no confidence vote is entitled to protection under

First Amendment); *Gardetto v. Mason*, 100 F.3d 803, 813 (10th Cir. 1996) (efforts to obtain no confidence vote is conduct protected under First Amendment).

Dr. Benison, in turn, has set out a cognizable claim for retaliation by association. Dr. Benison alleges Defendants retaliated against her because of her husband's protected activity. *See Thompson v. North American Stainless, LP*, 131 S. Ct. 863 (2011) (holding that an employee whose employment was terminated after his fiancée, a co-employee, filed a complaint with the EEOC had standing to pursue a Title VII retaliation claim). Accordingly, Dr. Benison may maintain a third-party retaliation claim on the basis of her husband's protected activity and has therefore met the first element of her prima facie case.

**B**

As to the second element, Plaintiffs must show that they were subject to an adverse action, which is an action that would "deter a person of ordinary firmness from continuing to engage in that conduct." *Mezibov v. Allen*, 411 F.3d 712, 717 (6th Cir. 2005) (citing *Thaddeus-X*).

The third element of a First Amendment retaliation claim "requires the plaintiff to prove a causal connection between the protected conduct and the adverse action. When assessing motive in the context of a summary judgment motion, bare allegations of malice do not suffice to establish a constitutional claim." *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 399-400 (6th Cir. 2010) (internal quotations and citations omitted). A plaintiff must demonstrate that his or her protected speech was a substantial or motivating factor in the adverse action taken by defendant by pointing to specific, nonconclusory evidence reasonably linking his speech to the adverse action. *Vereecke* at 399; *Rodgers v. Banks*, 344 F.3d 587, 602 (6th Cir. 2003). The Sixth Circuit has interpreted this inquiry to mean that a substantial or motivating factor is "essentially

but-for cause—without which the action being challenged simply would not have been taken."
*Vereecke* at 400 (quoting *Leonard v. Robinson*, 477 F.3d 247, 355 (6th Cir. 2007).

The Sixth Circuit has cautioned that a plaintiff's burden in demonstrating causation is not "trivial" and that "the analysis of motive in retaliation claims utilizes a shifting burden that may mean early dismissal." *Thaddeus-X* at 399. If a plaintiff establishes a prima facie case of First Amendment retaliation, the burden shifts to the defendant to show that he had a valid, nonretaliatory reason for taking the adverse action. *Vereecke* at 401. "Once the plaintiff has met his burden of establishing that his protected conduct was a motivating factor behind any harm, the burden of production shifts to the defendant. If the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment." *Id.* (quoting *Leonard v. Robinson*, 477 F.3d 347, 355 (6th Cir. 2007)).

**i**

Dr. Benison claims she was subject to three adverse actions that were motivated by her protected conduct: (1) she was denied a promotional salary increase, (2) CMU brought a suit to recover her sabbatical salary in state court, and (3) she suffered a constructive discharge from her job at CMU.

Dr. Benison's first alleged adverse action—that she was denied a promotional salary increase—is more appropriately subdivided into three separate acts. These three acts—(1) the departmental vote against her application, (2) the delays in reviewing her application, and (3) the breaches of the Faculty Association Agreement—form the foundation of her claim that she was denied a promotional salary increase. Each action will be addressed individually to determine if it is was an adverse action motivated by Mr. Benison's no confidence vote.

The term "adverse action" arose in the employment context and has traditionally referred to actions such as "discharge, demotions, refusal to hire, nonrenewal of contracts, and failure to promote." *Thaddeus-X* at 396. The Sixth Circuit has held, however, that any action that would deter a person of ordinary firmness from exercising protected conduct will suffice. *Id*. Moreover, because "there is no justification for harassing people for exercising their constitutional rights," the deterrent effect of the adverse action need not be great to be actionable. *Id*. at 397. "The plaintiff's evidentiary burden is merely to establish the factual basis for his claim that the retaliatory acts amounted to more than a de minimis injury." *Bell v. Johnson*, 308 F.3d 594, 606 (6th Cir. 2002).

### a

At the departmental level, Dr. Benison claims she suffered an adverse action when the EAS Department voted against recommending her application for salary increase. A denial of a promotion is an adverse employment action, and therefore Dr. Benison has established the second element of her prima facie case regarding this claim. *Lulaj v. Wackenhut Corp.*, 512 F.3d 760, 765 (6th Cir. 2008).

Dr. Benison has provided evidence that the departmental vote was motivated by her husband's no confidence vote, thereby meeting the third element of her prima facie case. Dr. Benison asserts that her colleagues Dr. Leigh Orf and Dr. Sven Morgan "led the charge" in the departmental meeting because they were angry about her husband's no confidence vote. Mot. Summ. J. Ex. 1 at 61. She alleges that Dr. Orf, an academic senator who was present at the no-confidence vote, persuaded other EAS Department members to vote against Dr. Benison's salary increase. Dr. Benison states she overheard Dr. Orf repeatedly state that "he was going to teach [Dr. Benison] a lesson" after the no confidence vote; she also claims he made "negative" remarks

during the departmental meeting. Mot. Summ. J. Ex. 1 at 40; Ex. 14 at 20. In addition, she claims that Dr. Morgan also told her several times that he was going to "teach her a lesson." Mot. Summ. J. Ex. 1 at 45. These statements, taken together, are sufficient to create a triable issue as to whether the EAS Department's negative recommendation was motivated by the no confidence vote.

Although Dr. Benison has established a prima facie case for retaliation based on the EAS Department's negative recommendation, the Defendants have shown that there was a valid, non-retaliatory justification for recommending that her salary application be denied. In the departmental vote, the professors explained that their recommendation to deny Dr. Benison's salary application was based on her inadequate service record:

> Dr. Benison's service to the Department is lacking . . . Dr. Benison does demonstrate leadership to her profession but she does not contribute high quality leadership to Department service activities. The Department view is that Dr. Benison does contribute to service activities but these are mostly short-term, time limited commitments. The Department encourages Dr. Benison to take a more active role in the larger time commitment service activities, especially given the fact that Dr. Benison has had the lightest teaching load of any faculty member during the review period.

Mot. Summ. J. Ex. 20.

Dr. Benison had been repeatedly warned that her service record could cause problems when she applied for a salary increase. Dr. Benison admits that as early as 2010, one year before the no confidence vote, Dr. Morgan had told her that she was not providing adequate service to the department. Mot. Summ. J. Ex. 1 at 174. When Dr. Benison stated that she was unable to complete the WEAVE assessment on behalf of the department, Dr. Morgan warned her that he would vote against her promotion in 2012. *Id*. at 60. In fact, Dr. Benison acknowledges that Dr. Morgan's statement that "he was going to teach her a lesson" was related to his perception that she was not meeting the service requirements. Resp. Ex. 21 at 59. Moreover, Dr. Morgan

- 12 -

explained that his vote to not recommend Dr. Benison's application was based on her lack of leadership in service activities:

> The Chair [Sven Morgan] agrees with the Department evaluation and does not support Dr. Benison's application for promotion. Dr. Benison is an excellent teacher and researcher but she has not contributed leadership to Department service activities. In fact, her actions have led to a negative morale in the department because junior faculty members have to do extra service activities to make up for the lack of service by our full professors. Dr. Benison was asked and refused to take charge of our assessment activities even when she has had the lightest teaching load of any faculty member over the review period and when she knew she was going to have sabbatical and teaching buyouts for the entire following year (this academic year) . . . Dr. Benison has also refused to take on advising duties even though the Chair has asked for help over a two-year period.

Mot. Summ. J. Ex. 20.

Dr. Benison does not refute the Department's nonretaliatory reason for voting against her salary increase. On the contrary, Dr. Benison admitted in e-mails that the vote against her salary increase "stems from me refusing to do [the WEAVE] assessment by myself . . ." and that the "denial was due only to the WEAVE assessment that I declined doing . . . ." Mot. Summ. J. Ex. 17 at 1; Mot. Summ. J. Ex. 16 at 2. Defendants have produced evidence that the EAS Department's vote was based on Dr. Benison's service record. Because the EAS Department had a nonretaliatory reason for voting against her salary increase, this claim does not survive summary judgment.

**b**

At the review level, Dr. Benison claims she suffered an adverse action when Dean Davison and Provost Shapiro deliberately delayed the review of her salary increase application. According to the terms of the Faculty Association Agreement, Dean Davison is obligated to review the EAS Department's recommendation and render an independent judgment on the application.  Dean Davison ultimately recommended denial of Dr. Benison's salary application

because of her service record on April 2, 2012—one day after the deadline for filing his recommendation with the Office of the Provost. Mot. Summ. J. Ex. 23 at 3.

Dr. Benison claims that Provost Shapiro also purposely delayed reviewing her salary application, hoping that she would quit. She points to a May 29, 2012 e-mail exchange: after Faculty Personnel Services Director Matthew Serra states that the Benison residence had been sold, Provost Shapiro replies that "[t]he news just gets better and better." Mot. Summ. J. Ex. 39. Serra then suggests that "we hold out as long as possible before drafting a response on her promotion application to see if it is rendered moot by an official announcement of her resignation," which Provost Shapiro agreed with. *Id.* Dr. Benison claims that this e-mail exchange, in addition to Dean Davison's tardy recommendation, illustrate that she suffered an adverse action when Dean Davison and Provost Shapiro deliberately delayed her salary increase application.

Missed deadlines and six e-mails discussing the possibility of delaying Dr. Benison's application review provide little evidence that a person of ordinary firmness would have been deterred. Indeed, "certain threats or deprivations are so de minimis that they do not rise to the level of being constitutional violations . . . ." *Thaddeus-X* at 398. The delays in reviewing Dr. Benison's application were inconsequential: even though Dean Davison missed the deadline by one day, Provost Shapiro still took the application under review. After Dean Davison submitted his late recommendation, he met with Dr. Benison to "address errors of fact," as permitted by the Faculty Association Agreement. Dean Davison then affirmed his negative recommendation to Provost Shapiro on May 7, 2012. Despite the missed deadline, Dr. Benison was still able to voice her concerns to Dean Davison and to have her salary application reviewed by Provost Shapiro.

Therefore, the harm caused by Dean Davison's missed deadline is so de minimis that it does not rise to a constitutional violation.

Moreover, Provost Shapiro's allegedly deliberate delay in reviewing Dr. Benison's application is not an adverse action. As set forth in his e-mail exchange with Matthew Serra, Provost Shapiro had learned that Dr. Benison had publicly stated that she was taking a position at West Virginia University. Mot. Summ. J. Ex. 39. In fact, Dr. Benison accepted employment at West Virginia University on May 17, 2012, just 72 hours after submitting her application to Provost Shapiro. Mot. Summ. J. Ex. 30, 37. That Provost Shapiro decided to delay review of her application twelve days later had no effect on Dr. Benison's application: because Dr. Benison accepted employment at WVU, "[i]t made moot the point of whether she'd get a professor salary adjustment. She wasn't going to be here." Mot. Summ. J. Ex. 11 at 85. As evidenced by her acceptance of employment at West Virginia University, Dr. Benison had already decided to leave CMU by the time Shapiro delayed reviewing her salary application. Therefore, the harm suffered by Dr. Benison would not deter a person of ordinary firmness, and the delayed review is not an adverse action.

Dr. Benison has not established that she suffered an adverse action when the review of her application was delayed, and therefore cannot rely on the claim to establish a prima facie case.

**c**

Dr. Benison also claims she suffered an adverse action when Dean Davison and Provost Shapiro breached the terms of the Faculty Association Agreement by exchanging e-mails about Dr. Benison's application without her knowledge. The Faculty Association Agreement provides that "[a]ll evidence not submitted by the bargaining unit member and used in making

- 15 -

recommendations concerning reappointment, tenure, or promotion, shall be shared with the bargaining unit member . . . ." Resp. Ex. 6 at 30. Dr. Benison claims Dean Davison and Provost Shapiro violated this clause by circulating a series of four e-mails discussing Dr. Benison's service record on May 16, 2012. Resp. Ex.27. These e-mails were not available to Dr. Benison during the application-review process; she learned of them months later. Resp. 24-25. Dr. Benison claims that by not informing her of these e-mails, Dean Davison and Provost Shapiro breached the terms of the Faculty Association Agreement.

The breach of the Faculty Association Agreement, however, is not an adverse action because it would not deter a person of ordinary firmness from engaging in protected conduct. Dr. Benison claims she was harmed because she never had the opportunity to respond to the allegations in the e-mails. But Provost Shapiro never rendered a final decision on Dr. Benison's application, and therefore he never relied on her colleagues' concerns about her service record. Moreover, Dr. Benison publicly accepted employment at West Virginia University only one day after the e-mails circulated among Dean Davison, Provost Shapiro, and the others. Although Dr. Benison did not have a chance to rebut the claims in the e-mails, the harm she suffered is de minimis because Provost Shapiro never actually relied on the information in the e-mails to make a decision regarding Dr. Benison's application. Therefore, with respect to this claim, Dr. Benison has not satisfied the second element of her First Amendment retaliation claim.

**d**

Dr. Benison has not established a prima facie case of First Amendment retaliation based on the circumstances surrounding the recommendations that her application for a salary increase be denied. Although Dr. Benison suffered an adverse action when the EAS Department voted to not recommend her application, Defendants have asserted valid, nonretaliatory reasons for the

vote.   Regarding Dr. Benison's other two alleged adverse actions—the delays in the review process and the breach of the Faculty Association Agreement—these actions are not adverse actions because they would not chill a person of ordinary firmness from engaging in protected conduct. Therefore, Dr. Benison has not established a prima facie case in regard to these claims.

**ii**

Next, Dr. Benison asserts that she suffered an adverse action when CMU attempted to recover the compensation it paid her during her 2012 Sabbatical. Filing a lawsuit against a person would "chill a person of ordinary firmness" and is an adverse action that meets the second element of her prima facie case. *See Munroe v. PartsBase, Inc*., 2008 WL 4998777, at *3 (S.D. Fla. Nov. 20, 2008).

Dr. Benison has not, however, met the third element of her prima facie case: producing evidence that the protected conduct was a motivating factor in bringing the lawsuit in state court. Because direct evidence of retaliation is rare, courts generally look to two factors to determine whether a causal connection exists: temporal proximity and disparate treatment of similarly situated individuals. *Vereecke* at 401. Dr. Benison does not present any direct evidence that the no confidence vote was a motivating factor in bringing the state-court lawsuit, and therefore she relies on circumstantial evidence.

In analyzing whether temporal proximity creates an inference of causation, courts look to the totality of the circumstances to determine whether a retaliatory motive could be drawn. *Vereecke* at 400. "[T]he more time that elapses between the protected activity and the adverse employment action, the more the plaintiff must supplement her claim with 'other evidence of retaliatory conduct to establish causality.'" *Id*. (citing *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 524-45 (6th Cir. 2008)).

Here, temporal proximity does not support an inference of retaliation. CMU attempted to recover Dr. Benison's sabbatical compensation after she resigned in June 2012, more than six months after her husband's no confidence vote. A six-month time period between the protected conduct and the adverse action is insufficient, on its own, to show causation. *See Cooper v. City of N. Olmstead*, 795 F.2d 1265, 1272 (6th Cir. 1986) ("The mere fact that Cooper was discharged four months after filing a discrimination claim is insufficient to support an interference [sic] of retaliation."); *Powell-Kirby v. Spectrum Health*, 920 F. Supp. 2d 803, 807 (W.D. Mich. 2013) (a suspension that occurred one month after the plaintiff engaged in protected speech required additional evidence of retaliation); *Spencer v. City of Cattlesburg, Ky*, 2011 WL 1430237, at *12 (E.D. Kentucky April 14, 2011) (employee terminated two and a half months after engaging in protected speech had not proven a retaliatory motive based on temporal proximity alone); *cf. Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516 (6th Cir. 2008) (fact that employee was fired the same day he filed a complaint with the EEOC could sufficiently support an inference of retaliation).

To bolster her claim that there was a causal connection between the no confidence vote and the filing of the lawsuit in state court, Dr. Benison attempts to show that she was treated differently from similarly-situated professors; that is, CMU did not force them to repay their sabbatical compensation after they left. Dr. Benison relies primarily on evidence that four other professors left CMU after their sabbaticals, and CMU did not force the departing professors to return their salaries or pursue lawsuits against them.

Disparate treatment of similarly situated employees can give rise to an inference of retaliation, but

> the plaintiff must show that the 'comparables' are similarly-situated in all respects. . . . Thus, to be deemed 'similarly-situated,' the individuals with whom

the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.

*Gray v. Toshiba Am. Consumer Prods.*, 263 F.3d 595, 599 (6th Cir. 2001) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)) (internal citation omitted). A plaintiff and the similarly situated employee need not be "comparable" in "every single aspect of their employment". *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). Rather, a plaintiff must show that "all of the relevant aspects" of his employment situation were nearly identical. *Ercegovich* at 352.

Dr. Benison argues that she was treated differently than four other professors who did not return to CMU after taking a sabbatical, and therefore she has established retaliatory intent. These four professors, however, are not so similarly situated so as to give rise to an inference of retaliation.

The first professor, Professor Hanessian, is not similarly situated because she did not have "the same supervisor" as Dr. Benison. Professor Hanessian worked for CMU's Department of Art, and her waiver was approved by a Department Chair, a Dean, and a Provost that are all different from those in Dr. Benison's case. Mot. Summ. J. Ex. 52. Because Professor Hanessian did not work with the same supervisors, she is not similarly situated to Dr. Benison. Therefore, Dr. Benison cannot rely on Dr. Hanessian's situation to establish retaliatory intent.

Professor Jeon, the second professor Dr. Benison references, is not similarly situated because he engaged in conduct that has distinguishing circumstances. Professor Jeon returned to his native South Korea after his sabbatical ended, and CMU requested that he return his sabbatical salary. CMU officials declined to pursue a suit against Professor Jeon because of the difficulty in enforcing a judgment against a person in a foreign country. Mot. Summ. J. Ex. 52.

CMU officials stated that they would have "better options . . . to recover some of the money" if Professor Jeon ever returned to the United States. *Id.* The circumstances surrounding CMU's attempt to recover Professor Jeon's sabbatical salary are thus distinguishable from CMU's attempts to recover Dr. Benison's sabbatical salary, and therefore Professor Jeon and Dr. Benison are not similarly situated.

The third professor referenced left in 2009 at the end of her sabbatical. That professor, however, had converted her sabbatical into medical leave after suffering from a severe illness. Mot. Summ. J. Ex. 52. This 2009 professor was not similarly situated as Plaintiff because she was on medical leave when she left the university.

Finally, Dr. Benison relies on a professor who did not return after sabbatical in 2013. This  professor requested a waiver of the repayment obligation because she had returned to her native country to receive medical care. Mot. Summ. J. Ex. 52. In contrast, Dr. Benison never sought a waiver for repayment of her sabbatical compensation; instead of applying for a waiver, Dr. Benison assumed that Provost Shapiro would waive the repayment requirement: "I knew that there was a clause in the faculty association contract that said discretion of the provost, this could be waived. And I kind of assumed that because of—because I was being forced out that it would be waived and that they would just let me go." Resp. Ex. 21 at 8. Because she did not request a waiver of the repayment requirement, Dr. Benison is not similarly situated with the 2013 professor.  Because not one of the four professors referenced is similarly situated to Dr. Benison, she cannot rely on them to establish retaliatory intent.

Neither the temporal proximity of the lawsuit nor the experiences of similarly situated professors permits the inference that the lawsuit filed against Dr. Benison was motivated, even in part, by a desire to retaliate for her husband's no confidence vote. Therefore, she has not

established a prima facie case of First Amendment retaliation based on the lawsuit CMU filed in state court.

Furthermore, even if Dr. Benison had established a prima facie case based on the state-court lawsuit, CMU had a nonretaliatory motive for bringing the lawsuit. Dr. Benison resigned on June 6, 2012, thereby ending her employment at CMU. Mot. Summ. J. Ex. 40. A couple weeks later, on June 21, 2012, Dean Davison sent a letter to Dr. Benison that stated she would be required to pay back her sabbatical compensation pursuant to her contractual obligation, which required her to return to CMU for one full year after taking her sabbatical. Mot. Summ. J. Ex. 45. Dr. Benison allegedly breached the sabbatical agreement by resigning, and therefore Defendants pursued a breach of contract action in state court. An alleged breach of contract is a nonretaliatory motive for bringing a lawsuit, and Dr. Benison has not shown that the breach of contract claim lacks a reasonable basis in fact or law. Therefore, Dr. Benison's claim that Defendants filed the lawsuit to retaliate against her protected conduct does not survive summary judgment.

### iii

In her final adverse action allegation, Dr. Benison claims CMU forced her resignation and thus constructively discharged her on June 6, 2012. She claims that after the denial of her promotional pay increase and receiving threats that she would not be promoted, she was forced to look at other opportunities outside of CMU. In April 2012, Dr. Benison "recognize[d] that I was being forced out . . . I was never going to be treated fairly at CMU again despite the fact that I had always done well there. And that's when we became more serious about leaving."  Resp. Ex. 21 at 110.

In particular, Dr. Benison claims that she was not being "fairly treated" within her department. Resp. Ex. 21 at 112. Following the departmental vote to deny her salary increase, Dr. Benison claims that the working environment became a "hostile, hostile situation" because she was the "black sheep" and "not spoken to in the department." *Id*. at 65.

After Dean Davison recommended denying her salary increase, Dr. Benison began to "feel like actions were taken against me to force me to leave." Resp. Ex. 21 at 208-209. Specifically, Dr. Benison stated that "[s]eeing the dean's decision made it clear to me that I wasn't being treated fairly and that it wasn't just a couple people in my department, that it was a bigger issue than that." *Id*. at 111.

Generally, a plaintiff does not suffer an adverse action when he or she submits a voluntary resignation letter. *Woodmore v. Farmington Hills Police Dept.*, 2011 WL 2144522, at *4 (E.D. Mich. May 31, 2011). A plaintiff who resigns may nevertheless establish an adverse employment action by demonstrating that he or she was constructively discharged. *Avery v. Summit Health, Inc.*, 2013 WL 1278488, at *6 (E.D. Mich. Mar. 26, 2013).

"To constitute a constructive discharge, the employer must deliberately create intolerable working conditions, as perceived by a reasonable person, with the intention of forcing the employee to quit and the employee must actually quit." *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999). "To determine if there is a constructive discharge, both the employer's intent and the employee's objective feelings must be examined." *Id*. "Intent can be shown by demonstrating quitting was a forseeable consequence of the employer's actions." *Id*. Furthermore, the Sixth Circuit has held that the following factors are also relevant:

> Whether a reasonable person would have [felt] compelled to resign depends on the facts of each case, but we consider the following factors relevant, singly or in combination: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment

to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

*Logan v. Denny's*, 259 F.3d 558, 569 (6th Cir. 2001).

In contrast, criticism in performance reviews does not constitute objectively intolerable conditions. *Agnew v. BASF Corp.*, 286 F.3d 307, 310 (6th Cir. 2002). Even where a poor performance review indicates that the employee has little hope of future advancement, that evidence is insufficient to create a jury case of constructive discharge. *Caslin v. General Electric Co.*, 696 F.2d 45, 46 (6th Cir. 1982).

Here, Dr. Benison was not demoted. She enjoyed the same job with the same benefits until the day she quit. Dr. Benison claims that the working conditions within her department were hostile; however, that some of Dr. Benson's colleagues refused to speak to her is inadequate to create a triable factual dispute about the existence of an adverse employment action. *See Willey v. Slater*, 20 F. App'x 404, 405 (6th Cir. 2001) (co-worker ostracism and "openly negative and hostile" attitude by supervisor insufficient); *MacKenzie v. City and County of Denver*, 414 F.3d 1266, 1279 (10th Cir. 2005) ("[M]ere passive treatment does not constitute an adverse employment action.").

Although her service record has been criticized by the EAS Department and Dean Davison, these criticisms do not establish that she was constructively discharged. Dr. Benison had been repeatedly warned by Dr. Morgan and Dean Davison that her service record would weaken her application for a salary increase. After Dr. Benison turned down Dr. Morgan's request for her to complete the WEAVE assessment in 2009, Dr. Morgan stated that her refusal "did not demonstrate leadership in service duties," which is one of the criteria considered in the

promotional salary application process. Mot. Summ. J. Ex. 3 at 2. Dean Davison had also sent

Dr. Benison a warning in 2011 that she was not meeting her service obligations:

> [Y]ou are in an active employment status and have been relieved from any
> teaching responsibilities so that you may devote a greater proportion of your time
> to research. This does not remove your obligations to perform service to the
> department, college and university, including student advising in the Geology
> Club and actively participating in departmental meetings and committees . . . It is
> also important to be clear that the requirement to be actively engaged in service is
> non-negotiable and applies to all members of faculty . . . Please also keep in mind
> that failure to meet your service obligations, regardless of whether you teach or
> not, would likely result in a formal "complaint" against you in regard to basic
> work expectations/responsibilities."

Mot. Summ. J. Ex. 35.

Criticizing an employee's job performance is insufficient to establish constructive

discharge. *Plautz v. Potter*, 156 Fed. App'x. 812, 818 (6th Cir. 2005); *see also Bielert v.*

*Northern Ohio Properties*, 863 F.2d 47 (6th Cir. 1998) ("An employer does not constructively

discharge an employee simply by advising him that he must be productive in order to retain his

new job."). Therefore, the fact that the EAS Department and Dean Davison criticized Dr.

Benison's service record is not sufficient to establish that she was constructively discharged.

Finally, Dr. Benison claims that she was being forced out when Dean Davison denied her

appeal for a salary promotion. At the time Dr. Benison resigned, Provost Shapiro had not yet

rendered a final decision on Dr. Benison's application; rather, Dr. Benison resigned in

anticipation that her application would be denied. As the Sixth Circuit has observed, "[a]n

employee who quits a job in apprehension that conditions may deteriorate later is not

constructively discharged." *Agnew v. BASF Corp.*, 286 F.3d 307, 310 (6th Cir. 2002). "Instead,

the employee is obliged not to assume the worst, and not to jump to conclusions too fast." *Id.*

(internal quotation marks and citations omitted). That Dr. Benison believed Provost Shapiro

would ultimately reject her appeal for a salary increase does not support a finding that she was constructively discharged.

Dr. Benison has not demonstrated the necessary elements for constructive discharge. She has not presented proof of intolerable working conditions deliberately created by her employer nor has she shown that any such conditions were designed with the intention to force her to quit. Because Dr. Benison has not established that she was constructively discharged, she has not satisfied the second element of her prima facie case for First Amendment speech retaliation.

### iv

In summary, not one of Dr. Benison's claims survives summary judgment. With respect to her claim that CMU officials retaliated against her during the review of her application for salary increase, Defendants have provided a valid, nonretaliatory justification for the EAS Department's negative vote. Furthermore, Dr. Benison has not shown that the delays in reviewing her appeals or the breach of the Faculty Association Agreement are adverse actions that rise to the level of constitutional violations

As to Dr. Benison's claim that CMU retaliated against her by filing a breach of contract lawsuit in state court, Dr. Benison has not shown that the lawsuit was motivated by Mr. Benison's no confidence vote. Moreover, Defendants have set forth nonretaliatory justifications for bringing the lawsuit.

Finally, Dr. Benison's claim for constructive discharge does not survive summary judgment because she has not provided evidence of intolerable working conditions designed with the intent that she resign, and therefore she has not established that she suffered an adverse action.

Because Dr. Benison has not provided any triable issues of fact regarding her claims for First Amendment retaliation, the Court **GRANTS** Defendants' motion for summary judgment with respect to Dr. Benison's claims.

### C

Mr. Christopher Benison claims he suffered an adverse action when CMU put a hold on his academic transcript, which he needs to complete his degree in elementary education. Placing a hold on a transcript "would chill a person of ordinary firmness," and Mr. Benison has sufficiently established that he has suffered an adverse action. *Scarbrough v. Morgan County Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006).

Mr. Benison has not, however, established that his protected conduct was a motivating factor in placing a hold on his transcript. Mr. Benison has not provided any direct evidence of retaliatory intent, and the circumstantial evidence presented is insufficient to create an inference of retaliatory intent. CMU placed a hold on Mr. Benison's transcript more than six months after he submitted the motion for a vote of no confidence; this six-month time period is not "extremely close" and therefore Mr. Benison cannot rely on temporal proximity alone to establish retaliatory intent. *Vereecke* at 400.  Mr. Benison states that he was treated differently from other students who had holds placed on their transcripts because he was "the first person to have an academic hold placed on a transcript because CMU reversed a tuition remission."  Resp. 24. Yet Mr. Benison does not provide any evidence to support this allegation. This type of bare allegation of malice, without supporting evidence, is insufficient to establish an inference of retaliatory conduct. Therefore, Mr. Benison has not shown that his no confidence vote was a motivating factor in CMU's decision to place a hold on his transcript.

Moreover, even if Mr. Benison had sufficiently shown that his no confidence vote was a motivating factor, Defendants provided a nonretaliatory reason for placing a hold on his transcript.    As a benefit to employees, CMU provides a tuition waiver program for certain employees and their family members. Defs.'s Reply Ex. 63 at 2. Mr. Benison had been the recipient of one of these waivers while Dr. Benison was on sabbatical in Spring 2012. When Dr. Benison resigned, CMU claims she forfeited her compensation and benefits, including her husband's tuition waiver. Defendants argue that when CMU revoked Mr. Benison' tuition waiver, he became liable for tuition in the amount of $4,296.00. Mot. Summ. J. Ex. 11 at 107; Ex. 46 at 2. Mr. Benison did not pay that tuition, and therefore the CMU Registrar placed a hold on his transcript. Mot. Summ. J. Ex. 11 at 108. CMU placed a hold on Mr. Benison's transcript because it asserted that he owed them tuition, which is a valid, nonretaliatory motive.

Mr. Benison has not presented evidence sufficient to raise a genuine issue of material fact in support of the third element of his claim—causation—and therefore summary judgment in favor of Defendants is appropriate.

## IV

Neither Dr. Benison nor Mr. Benison has established a prima facie case for First Amendment retaliation based on Mr. Benison's no confidence vote.

Accordingly, it is **ORDERED** that Defendants' motion for summary judgment (ECF No. 16) is **GRANTED** and Plaintiff's Complaint (ECF No. 1) is **DISMISSED WITH PREJUDICE**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: October 23, 2013

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on October 23, 2013.

<u>s/Tracy A. Jacobs</u>
TRACY A. JACOBS